And Ms. Watson, could we call our first case, please? All right, will the lawyers on Marco Geronimo-Ocampo please approach? And why don't you tell us who you are and who you represent? Good morning, Your Honors. My name is Kathryn O'Daniel, and I represent Mr. Marco Geronimo-Ocampo, the appellant. Good morning, Your Honors. I'm Assistant State's Attorney Sarah McGann on behalf of the people of the state of Illinois. All right. And I'll tell you both and everybody in the courtroom, thank you for being here today. I know it was a struggle, not nearly as bad as it's going to be tomorrow. So I consider ourselves lucky. And Ms. O'Daniel, how much time would you like? 20 minutes, Your Honor. Okay. We do have another case in a half hour. Ms. McGann? Your Honor, 15 minutes max. All right. And within that 20 minutes, I'm going to hold you to a couple of minutes of rebuttal? Yes, Your Honor. I'll try to pleasantly surprise you by being as direct as I can. All right. And whenever you're ready, I'll tell you again both that we have read the briefs, you're familiar with the record and the issues that you're raising. Okay? May it please the Court and counsels for the people. There are three issues that we raise that are critical to the outcome of the appeal. In my belief, the sufficiency of the evidence is the most critical, and I'll spend the bulk of my time on that. The Court is well aware of the standard of review, and we're not dealing with minor insufficiencies or just one or two instances. We're dealing with a case where there is absolutely no physical evidence to corroborate the word of the defendant. But there doesn't have to be physical evidence, does there? There does not have to be physical evidence, but in a case where the defendant's guilt or innocence rises and falls on the word of the complaining witness, it certainly would help. Well, it would help, but we don't have it, so that's not the end of the case and the analysis. It's not part of the analysis. Well, let's look at what we do have, since we don't have that. First, you're not contesting that identity, correct? We are not contesting identity. Okay. And you're not contesting force? We are contesting force. You are contesting force. Where in your brief do you contest force? We have contested that. Where in your brief do you contest force? Well, I would say the entire first issue, the thrust of the argument is that no force has been proven. An incident hasn't been proven. Your claim is that the incident didn't happen. Correct. Right. I hope that addresses your argument. I mean, your question, Your Honor. In this case, it's our position that the testimony is inconsistent. It's contradictory. It's impeached. It's not corroborated by physical evidence. As the Court is well aware, A.H. is the one eyewitness here. She is late at night on Division Street, presumably, as other case law has recognized, with respect to Fullerton Avenue, a busy thoroughfare and well-lit. She admitted to having been drinking that evening. And though we're not contesting identity, she didn't have glasses on, and she had vision issues, which she testified to in court. Her testimony was to two encounters, whereby a man, she claims, pulls up, jumps out of a car and approaches her. She can't identify the vehicle. She claims she's propositioned for sex. Well, we know the facts. The judge said that he did not find enough evidence for criminal sexual assault, but he did find enough for criminal sexual abuse. So, I mean, what you're telling us, go to the abuse question. Well, I think I have to get to the abuse question by talking about the fact that the evidence that is of record doesn't support a conviction for anything whatsoever. Right. We got to look at what the judge was there. He heard the evidence. He saw the three witnesses. And the judge felt there was touching. I mean, he said that that's what sexual abuse was touching, whether it was on the fence or in the grass. All he needed was some touching. And he felt there was enough touching there that she had testified to. He believed her. We respectfully disagree. So you believe it's a credibility question? Yes. We absolutely believe it's a credibility question. Oh, so we should reverse the judge on this credibility question because? Well, I would point the court directly to People v. Herman. The parallels are pretty marked, and I'll go right there. Both cases turn on the credibility and the reliability of the testimony provided by the sole eyewitness, the occurrence witness. And in Herman, this court found that the complainant's testimony was too flawed to sustain a conviction. And the main reason offered for reversing the conviction in that case was that the complainant's timeline was off by six to eight hours, depending on which account was looked at. And this court found that that was not minor. In this case, the complainant tells the responding police officer, it happened a full day before. But Herman had to do with somebody who had a drug situation. She was trying to extort money from the defendant. We have nothing like that here. I mean, this is a very different case from Herman. We respectfully believe that they're fairly aligned, Your Honor. I understand that. That's why you're arguing it. But I'm saying that if you look at it, it's a much different case. And starkly, to me, it's starkly different from the victim here. It's starkly different than the victim in Herman. Well, in both cases, the complainants admitted to having consumed the one with drugs, obviously. That is irrelevant. What does that have to do with this? The fact that hours before she may have had a drink or two, Detective Burns testified he didn't see anything. And that has no relevance to the attack. I don't understand that. What does that have to do with it? Well, as the court pointed out, Herman, when you evaluate a complainant's testimony, drug or alcohol use is certainly a factor in their credibility, their ability to recall things. But he found her credible on the touching. And, again, we respectfully disagree with that. But he found her incredible on the penetration. Correct. And, in fact, the court, it's unique here because the court, sua sponte, ordered the transcript, went back through it, and based on that reversed himself and ultimately acquitted the defendant of all original charged offenses. So this is the site of the first attack? Yes. The chain link fence. This is right in front of a residence, a number of residences, right? Yes, Your Honor. And there any evidence that she cried out? There is no evidence that she cried out. There is no evidence she tried to cross the street. I am not here to victim shame. I want to put that out there. But there is no evidence that there was any form of an outcry. There's no evidence she tried to hail a passing car as this court. Do we know there's a passing car? Well, I'm just referring this court to the Yergin opinion, where the courts in that case said many things that you would expect to have happened based on this complainant's version of events are notably absent. Well, this is early in the morning. There may not be any traffic right there. I mean, we don't know. I mean, that's all speculation. And you're asking us to reverse some speculation? If we look at the video of the convenience store at the intersection of California and Division, it's quite busy, right? Yes, Your Honor. It is quite busy. And there are a number of people, as the court has clearly, and we appreciate the fact that you've looked at the video. There was no interaction between them, obviously. There was never alleged to have been in that video. And speaking of that video, the only thing it shows is that Mr. Geronimo Ocampo was present. Going back to the Herman case, the condom, the condom with DNA all over it, showed interaction and showed presence. We submit that the video is no more effective and shouldn't be any more effective on tool on appeal than the condom was in the Herman case. It definitely proves that he was at that gas station. But as the court well knows, mere presence at the scene of an offense is not enough to sustain a conviction. But there wasn't a scene of an offense. He's correct. He went out the same direction she did. Correct. And I'm glad that Justice Mason showed the scene photo because the complainant's testimony is very clear that the first alleged attack happens and then she's able to walk two to three or three to four or four to five steps away. West. She walked west. That's correct. West down Division Street. And so when you look at the Yergin analysis, things that you would expect to be there but noticeably are not. The court has the picture. It's warm. It's grassy. It's dirty. There was a little mound of debris she described. And she was wearing white clothing. At least her shorts were white. I think it's reasonable to believe that if anyone who came in contact with her, either Ms. Diaz or the original officer, had noted any disheveled appearance on her, they might have summoned an evidence technician. Yet that was not done. And nor was there any testimony that she appeared disheveled. You're just talking speculation. You're creating to me the only question is whether there was abuse. And the judge found her credible on the abuse. And so besides speculation, what is there in the record that would indicate that this didn't happen, this is all a figment of her imagination? I'd be glad to address that. Your Honor, when you look at her testimony, her statements alone, I'll just simply address her statements. And since there are no other witnesses and no physical evidence, which you pointed out at the beginning of my presentation, we're left with her word. And let's look at her word. Well, we also have Diaz, who said that she came to her, hugged her, tears in her eyes, obviously very, very upset. No outcry. But no outcry. Didn't ask her to call the police. We would expect that, according to the opinion. A 14-year-old girl, I mean, you know, she's just gone through a horrific episode. You know, you're saying that everybody should react a certain way. I don't think that's necessarily true. I mean, people react to tragedy or events in different ways. And she, the fact that she didn't outcry, I mean, what, some people don't. Maybe they, she wanted to go home. She wanted her parents. That's what she wanted. Your Honor, certainly no two people alike, you know, reacts to stressful situations alike. But the law doesn't carve out a special exception. The law says look at what did happen. So let's look at her statements. And there is no outcry to Ms. Diaz. She doesn't even ask Ms. Diaz to call the police. And there's, her testimony was that she did, but Ms. Diaz, her testimony was no. She didn't call the police. I only called the police because I didn't know what to do with a girl out late on the street in the middle of the night who can't reach, who can't contact her family. She wasn't going to just leave her there. She was a responsible citizen in my estimation. But let's look at what she did say. First statement that she makes is that it had happened a full 24 hours earlier. Then she says, he kissed my neck. She doesn't say that at trial. He rubbed my breast. She does not testify to that at trial. He pulled out his penis. She does not testify to that at trial. He rubbed it on me. She does not testify to that at trial. That, I think, is very critical. It's a giant impeachment by omission. But it's also critical because she told the officer that had she agreed to have medical treatment, perhaps semen would have been preserved, which would have been absolutely compelling. But going back to her statements, she claimed that she called the police. She was impeached by that at trial. Ms. Diaz, she eventually had to agree. The A.H. eventually had to agree. Yes, it's true. I didn't call the police. I asked Ms. Diaz to. Ms. Diaz's testimony is, as I said, I did that on my own because I wasn't going to leave a young lady in the street by herself. She testified at trial, but the full extent, I think the exact question was sum and substance, of the encounters were exactly what she had testified to at trial, and then she was confronted by her prior inconsistent statements, and she offers, I forgot to say those things. And she's asked, did your testimony match what you told police? Again, she's. The question was, did you forget? And she said, yes, I forgot. So she was just paraphrasing the question when she said, I forgot. Nonetheless, when she runs or walks, she claims she ran into the arms of Ms. Diaz. Ms. Diaz says, no, she walked, which brings the Yergin opinion to mind, things that you would expect to see, one would be running, one would be trying to flag a motor, as Yergin itself states, crumpled, disheveled, stained clothing. One might be going into the convenience store that was between her and Ms. Diaz. Another excellent point, Your Honor. And none of those things happened. And there was inconsistency with respect maybe to your point, Your Honor. His hands, his hand, his fingers, his finger. That possibly is what caused the court to go to the extra step of ordering the transcript sua sponte and reversing itself. But there are oceans of difference between what she first said to the police and what she testified to at trial. So I think that probably best highlights, maybe best answers your question, what's my argument about how this didn't happen. It hasn't been consistent. And, you know, the case law in the first district says that if it's just one thing or maybe two things, then maybe that's okay. But here there are multiple things within her own, and all we have is her word, within her own testimony that are not corroborated by physical evidence and that are not corroborated by what she said at the beginning, or what she said when she first had an opportunity to speak to police. And I think it's really inexplicable for her to have said it happened a full 24 hours. It was yesterday, you know, a full 24 hours ago. And I think when you look at the fact that as soon as this comes out on the media, the police get a call and this defendant ultimately surrenders himself right away. I think that that's something that can be considered. With respect to the things that you would expect to see but that were not there, A.H. testified that she was able to push her assailant off on two separate occasions. She didn't run away. She just got up and walked away. Now, if that were the only thing I was able to argue to the court, it probably wouldn't even cross your mind to reverse it, but this is not just the only thing. It kind of feeds right into your Jurgen opinion about things that you would expect to see. There was no screaming, no outcry. And no outcry to Ms. Diaz. That's another thing I think is really an important thing that we don't have here. And we would ask the court to consider applying the Herman opinion to this. There are many parallels. I know you may disagree, Your Honor, but in that case, we have a complainant who begged to go to the hospital, and she was finally taken to the hospital. Here we have one who refused, who denied medical treatment, who refused to go to a hospital. And curiously, instead of even being taken to a police station and processed for any form of evidence, she was simply driven home. And we have, on top of that, no evidence from anyone, the officer or Ms. Diaz, that she appeared, at least her clothing, appeared in the slightest disheveled. We have Ms. Diaz's testimony that she was breathing heavily and appeared upset. I would submit that if a cat call, if she had just heard a cat call from a truck, she may have the exact same reaction. I would not argue that that is corroborative, that she has just been attacked. And in both this case and Herman, the courts both entered reduced findings, reversed themselves and entered reduced findings to lesser included offenses. Other thing that the court can consider is things she couldn't remember. She couldn't remember a lot of things about or parts of her evening, which does go to her credibility under the case law. She can't remember if she ate anything. She got lost on the ride home. And certain components of the attack at trial, she couldn't remember to say those. Her excuse for that was, I forgot to say those things, major components of the attack. Well, again, she was led to say, forgot, because the question was, did you forget? So she said, yes, I forgot. Well, when she's asked, though, open-ended questions on direct, she's asked to tell us what happened, and that's what she said. Usually lawyers may follow up on that a little differently than this particular lawyer followed up. Perhaps, but what we have, what's in the record. Well, you have now a 16-year-old girl, but she was still 14 at the time of the occurrence, two years later. So she may not, and she's nervous probably. But she leaves out that he exposed himself to her and he rubbed himself on her, grabbed her breasts and kissed her neck. They're not minor differences. That would be our position. And the last part of the reasonable doubt argument, the sufficiency of the evidence we raised, and it kind of straddles two different issues, I realized that it was a sentencing finding. But nonetheless, I think that it can be taken into consideration, because at sentencing the court said, I remember the case well. And no doubt the court did remember, having gone to the extra effort to order the transcript. I remember the case well. It was in the early morning hours. And then the court goes on to say, I believe, I saw the video. Granted, you don't appear to be intoxicated. And the probation report says you hadn't been drinking then. But the court finds a circumstantial connection between the offense and the defendant's alcohol consumption. It was absolutely. But that's a sentencing, so that has nothing to do with the findings. However, he says in imposing sentencing, I remember the facts well. And then he gets into, he found a circumstantial connection between alcohol consumption and the offense. The only alcohol evidence was the victim's consumption of alcohol. And the court believed the defendant drank that night. And there was a connection between drinking and the offense. And he goes on further to say, I believe you may have an alcohol problem. The reason that I think it's an appropriate argument to make is that the court then had as the option, and it's in our appendix, there was the option to, if it's strictly a sentencing observation the court makes, the court had the option to order him to undergo alcohol treatment. And the court did not order any alcohol treatment. Simply said, the court said, it found a circumstantial connection between the defendant's alcohol consumption, which may even be a disease for which he needs help, and the facts of the case. In essence, the court made a finding that's completely not supported by the record. There is absolutely no evidence whatsoever. How about the pre-sentence investigation report? The pre-sentence investigation report no more lends any support that this offense. Not offense. I'm saying whether he had a drinking problem. There was a paragraph. Okay. So that's where he got this idea. You're saying, though, it somehow influenced how he decided the case weeks before. I don't understand it. Well, when you look at the court's comments. I have. I'm sure that you have. The court says, I remember the case well. Right. It's in the early morning hours. And then the court says, goes into, I believe there is a, I believe there's a circumstantial connection with alcohol. I believe there's a connection between alcohol and what I think happened that night. But the pre-sentence report doesn't say anything about, yes, he was drinking that night, nor does the video. And the court said the video doesn't appear to show that he was in any kind of intoxicated condition. Correct. And then the court. That night. That's correct. And then the court nonetheless goes on to say, but I believe there's a circumstantial connection between your alcohol consumption and what happened that night. And then encourages the defendant to do some soul searching to see if maybe I'm correct on that. It is our position that that's a due process violation. That is a finding that. It's not a finding. Where's the finding? He already decided the case. This is at sentencing. I understand that it was at sentencing. But, Your Honor, it certainly, it certainly appears as though the court, having said, I remember this well. Okay. So the court said, let me read what the court said here. This is in early morning hours of August 9, 2014, which, according to the defendant, he last consumed alcohol in July of 2014, which would seem to suggest that he wasn't drinking at the time of this offense. He wasn't drinking. It seems to suggest. But I believe that. And this is just a recommendation to you. I'm not punishing you for, if you do abuse alcohol, because alcohol abuse is an illness, not a crime. But he says it very clearly. He goes on to say, I believe there's a connection. There may be a connection, but he's not saying that he drank alcohol at that time. He says he's not even, it's a recommendation. He's not punishing him for it. So I don't see the relevance. Well, when you flip the page to the very next paragraph, to me, circumstantially, I believe there may be a connection when, between, with, I'm sorry, there may be a connection between what I believe happened on that night and alcohol consumption. I don't know. I can't say in the video that I saw anything that would lead me to believe you were intoxicated. But I recommend you do soul searching and see if there isn't something about that that has a ring of truth to it. So? You're trying to tell him, you know, you've had an alcohol problem, just stay away? But it's certainly a unique tell into the Court's thought process after the Court specifically says, I remember the case well, and then says, circumstantially, there may be a connection between what I believe happened that night and alcohol consumption. There is, the fact remains, the fact remains, there was no evidence that this offense, alleged offense. It doesn't matter. You already made the decision, so I don't see relevance. That has a due process. We respectfully, we respectfully disagree, Your Honor. There is a case that says that. I do? There is a case I would cite to the second issue that we raised. And I think the, probably this Court would consider it dicta, but the gist, while I'm searching for it, is that if it's on a judge's lips, it's in a judge's mind. Well, but then we're talking weeks later. Okay. Go ahead. Go ahead. We're talking weeks later. So what's on his mind at the time of sentencing is a lot different than may have been on his mind at the time of deciding guilt or innocence. That's a brilliant segue into my third and final issue. Actually, the second issue, I'll briefly stop there, and then I'll get to the third issue. Even if it did happen at sentencing, there is no evidence that this offense was alcohol-related. So we believe that that's a due process violation at sentencing, and we respectfully would ask the Court to take a good look at that because there is no evidence of alcohol with respect to this offense other than that which the victim agreed that she drank that night. Which brings me to my third and final issue, and that is burden shifting. It's a due process violation, in our view, occurred when the Court asked, as this Court knows and is very, very well familiar with facts, the Court reversed itself after it found a 14-year-old young lady is perfectly capable of testifying as to whether an individual has inserted his finger into her vagina or not. And then I, then the Court said he was there, they were there at the same time, same place, and he found the defendant guilty based on those two things. Well, he asked a question, wasn't it? I thought it was a question. How do you explain his presence at the exact same time and place as the victim? That's the question, isn't it? That's the question. That's the question. So how does an isolated question go to changing the burden of proof? Where is the judge? I mean, this judge, in fact, knows the burden of proof. And in his ruling, it's on the State. So he asked a question. I don't understand how you can say one question, which has nothing to do with burden of proof, somehow change the burden. The defendant doesn't have any burden to explain, right? Correct. That's exactly my point. But I'm going to go back. Well, that has to do with identity, the question. You know, if there was a question of identity during trial, that would go to identity. Well, Your Honor, with all due respect, what the court, in finding the defendant guilty, said, and I quote, and it's from the record at page 99, I believe a 14-year-old and young woman is capable of saying whether or not someone's digit was inserted into her vagina, a finding the court reversed two days later. But the court also said, and I also think there is corroboration in that these two are at the same exact location at the same exact time. It was not a question. It was a finding. But the question that the court is talking about is when the defense lawyer was arguing in his closing argument, after he had rested and after he had decided not to call the defendant, the court then asks, how do you explain the defendant's presence at that sitco at the same time as A.H.? How do you explain? That is burden shifting. It seems rather textbook. The defendant doesn't have to explain. You didn't raise plain error in this, did you? I'm sorry? You didn't say anything about plain error in your brief? I did not. There was a due process kind of a catch-all boilerplate motion for a trial that was filed. So was there an objection during the court's ruling? There was not. However, the fact remains the court asked the, and the defense lawyer did say, Judge, we don't have to. I think he said there were a lot of people in there. And besides, mere presence is not proof beyond a reasonable doubt. And I think that's a good way to summarize in this case. This is not a case with one inconsistency that's backed up with physical evidence or two inconsistencies. This is a case with multiple inconsistencies. And there are at least as many inconsistencies here as there were in the Herman case. And we are asking, respectfully asking that the court reverse. Thank you very much. Ms. McGahan. Good morning. May it please the court. Your Honors, let me just remind the court, as you very well know, the standard of review here is when viewing the evidence in the light most favorable to the people. Could any rational trait or effect have found the defendant guilty of criminal sexual abuse? And the answer to that question is yes. And that's exactly what happened here when the trial judge found the defendant guilty, ultimately, of criminal sexual abuse. Multiple discrepancies that counsel just described. Your Honor, I first want to point out that counsel makes many innuendos and references to the old standard, which has long been abolished and required of sex victims. Corroboration, clear and convincing testimony, physical evidence as corroboration. That's not required. And it's the same standard for all cases, for reasonable doubt cases. It could be the single credible testimony of a witness. And we have that here. We have a prior fact. The trial judge found the victim, who was 14 years old, her account to be credible. Well, didn't he find it incredible in one very important aspect, and that is the issue of penetration. He originally found him guilty of criminal sexual assault. Your Honor. For which penetration was required. And then sua sponte, reversed himself, saying he didn't believe her. And, Your Honor, I don't want to speak for the trial judge, but the record appears to show that during the direct examination of the victim, the judge inserted some questions to clarify penetration. And those were just elicited by the judge. But he didn't say, I shouldn't have injected myself, I shouldn't have asked that question. But she did answer, yes, he penetrated me. And he originally believed her, and then thinking about it, said, I don't believe her. I don't think the judge, in doing that, found the victim to be incredible. I think the judge reviewed the transcripts, gave thoughtful consideration to the fact that it was not elicited during her direct examination or the cross-examination. Her testimony established sexual conduct, and it was the fondling of her vagina. So in reviewing the transcript, the judge did retract the penetration component, finding that it was. Didn't believe that she had been penetrated, even though she said she was. She forgot to mention that Diaz took out his penis, rubbed it against her, kissed her neck, and fondled her breasts during the first attack, right? Your Honor, I think, yes. So during the first attack, he did these things that she did not mention. And then, according to her testimony, she walked away. In run, she walked. Sure, and I know counsel makes much mention of not screaming for help or walking away, but the reality is she just underwent a traumatic experience, and it's not contrary to human experience that she would be shocked and startled. Then it happens again when he comes up behind her, takes her up to this grassy place, assaults her again, and she continues to walk west after the second assault, right? She's walking away from the convenience store, away from the bus stop where she got off the bus, and away from the location where she met up with Diaz. Yes, she does. Because she wasn't shocked? Yes, I would submit to this court. You would say that? She was startled. She does testify she was startled. And the second time, Your Honor, she does testify that she runs. She testifies that she kicks the defendant, pushes him off of her as he pulled down her stretchy shorts and was fondling her vagina. She's able to get away the second time run. Her testimony is she was so happy to see Ms. Diaz, who is essentially ñ between her and Ms. Diaz. She ran into Ms. Diaz serendipity. She didn't know if she was going to get off that bus. Sure, and thankfully, she did run into her. And as Ms. Diaz testified, she practically jumped into her arms. She was teary-eyed. She looked scared, and she looked like she had breathing heavy. Do you think a 14-year-old who was catcalled in the middle of the night, hey, don't go away, where are you going, you think she might be scared and teary-eyed? Certainly, but that was not the only testimony. And any inconsistencies were weighed by the trial judge here. He heard those inconsistencies in the whole entirety of her testimony and found that any holes were not enough to make her incredible. And I think that counsel really hones in on the organ, which is a 1992 case, just after the standard shifts where there's not extra burden on a sex offense victim. That case is so different from this case. We had two defendants there who approached the victim, and they take her to an alley, allegedly, and forcibly pull her into that alley, forcibly remove her clothing. They penetrate her anally, and this victim did not have a vagina. She had unusual genitalia. She had just a urethra. So they try and penetrate her, at least one defendant, in her urethra. She gets medical attention. She, you know, calls the police. There's no evidence from the medical standpoint that she had any trauma. The point is, is her testimony was completely contradicted by the physical evidence. We don't have that here. No physical evidence. No, and it's not required. I understand it's not required, but given the video showing the white, bright shorts that the victim had on, and her testimony that she was physically thrown to the ground and assaulted by this defendant, would it stand to reason she'd be at least a little bit disheveled when she ran into Diaz? I think her testimony showed that she was startled and scared, not disheveled per se, but semantics, and I will argue that she did testify that her white shorts were really stretchy. The defendant was able to, against the fence, when he was pinning her against the fence, try and push those to the side for the first fondling. They might have been stretchy. They weren't dirt-proof. Well, again, Your Honor, the physical evidence was not a far departure to make her testimony in its entirety incredible. It's not completely contradicting her testimony, is my point, where if you, like the victim in Yergin, are claiming all of this force, penetration, ejaculation, and that victim sought medical assistance, you would then expect some physical evidence, and there was none. So her testimony was contradicted. We don't have that here. We have a victim whose testimony was corroborated. It was corroborated by Ms. Diaz, who, no stake in the game, is just coming home. She puts Mr. Ocampo in his dark SUV behind the westbound bus, right? Yes. Calling out to A.H., presumably. So that would mean that Mr. Ocampo, who assaulted the victim five blocks west on Division, would have had to come down eastbound on Division, on the south side of the street, where A.H. was with Diaz. Didn't call out to her then. He went and made a U-turn and got behind the bus and then called out to her. I can't speak for the defendant's actions following. But I'm just saying, this is what the evidence. Diaz says he was on the north side of the street behind the westbound bus. Sure. And I think that any inconsistency there, or just that testimony, does not diminish the credibility of Ms. Diaz, the victim. And I would point out that the video is corroboration of the victim's testimony, and the trial judge watched that video as the victim narrated her identification, which is what she made when Detective Burns, in his good police work, he picked up the victim just hours after the incident, and she willingly showed him her path. The first bus stop, then the sit-go, then the fence, and then the grassy knoll area. And in his wisdom, they watched the video surveillance. There's no testimony that he said, your attacker's on this video surveillance, they're looking for anything. So fortunately for the victim, she was able to identify her attacker. Unfortunately for the defendant, he was in that video, and so was his dark SUV. Wait, there were a lot of people in that store. Yes, there were. Some of them were men. Yes, Your Honor. And I would submit to the court that that bodes well for us. She was able to discern who her attacker was amongst many. Or she might have just picked one out at random. I think that the trial judge heard her testimony and found her to be credible. Well, he didn't find her to be credible. That's the whole point. He said that there were some problems with her testimony. He did not find that the people met their burden for the penetration element. Okay. She didn't have her glasses on. She wasn't wearing glasses in the store. She testified she needs her glasses. She didn't have her glasses in court. Did she have her glasses when she looked at the photo lineup? No. So we have a couple problems here, a couple layers of problems here. In the first place, there were a bunch of guys in this store. We don't know how many of them had black SUVs. Maybe only one, maybe two, maybe ten. We don't know. I don't know. Your Honor, the glasses point, we're talking about a girl who navigated from the far south side taking a bus and then knew how to get to the Citgo. No, Counselor, I'm sorry, I don't mean to interrupt, but she testified that she got lost on the bus. She didn't navigate on the buses. She was confused. She had been drinking. She's 14. She was confused, and somehow she wound up at this particular bus stop or on this particular bus, saw a Citgo station. She was hungry, and she got off, went to the Citgo station. She did not navigate. She was at California and Division. She was intentionally going to Division to take that bus west. She wound up there. So she was waiting at a bus stop, and her testimony, I think, was that it was taking too long, and so she went to go and buy some pop and chips. We have no evidence that she has a vision problem, just that she wears glasses. We don't know what the nature of the problem would be. Why would you wear glasses if you don't have some vision defect? You know, I should rephrase that, that it would affect her ability to see. We don't know if it's nearsighted, farsighted, if it's astigmatism. We don't know. She said in court she couldn't identify the defendant. She couldn't really see him well because she didn't have her glasses. And then she stood up, Your Honor, and she unequivocally stood up and said, yes, the blue tie and the black suit. And I would remind the court, when he attacked her, he's right in front of her. It's his face, and she testified. I only was looking at his face because that was her attacker on two occasions. She saw him up close and personal. So I would submit when she saw that video, and there were many people in the video, and she saw her attacker, she knew, and it was unequivocal. And she made another identification when they pulled a different photograph of defendant. When she decided, after the first attack, and she walks away in the same direction that his car is driving, that to me is a little peculiar. Like what, even a 14-year-old that's in shock, it seems to me, would be running in the opposite direction. Then he apparently pulls up to her, having been following her in the same direction that she's walking, and again, he's in the car. She still has time to cross the street, run the other way, get away from him. She didn't do that. She was 14 years old. I understand. I mean, I have children. I have girls. I understand 14-year-old girls. But now she's been attacked once, the same guy is following her, and instead of running in the opposite direction, crossing the street, running in the opposite direction, back towards where the CITCO station was, where there are a lot of people and presumably some sense of safety, she didn't do that. She walks into the dark. This is what I'm not getting. Well, Your Honor, are you referring to after the first attack at the fence that she walks away, or after the Grassy Knoll incident? Well, my testimony was that she walked after both attacks. So after a defendant pinned her against the fence, her testimony is, yes, she pushed him off and walked away. But soon after, moments, he grabbed her from behind and pulled her to the Grassy Knoll. Her testimony is she was kicking, and she pushed him off, and that she ran away at that point. She ran west. Yes, and after a traumatic incident. How did she get back five blocks east to Diaz? Is there any explanation for that in the record? Just, Your Honor, that she just experienced a traumatic sexual encounter with an attacker that she did not know, was not expecting. She was just trying to get to her next bus stop. You know, in the language of this court, it was not contrary to human experience. She was just reacting and trying to survive. My point is, we don't know. Since she testified, she said, I know directions. I went west after the second attack. There is no explanation in the record if she went west after the second attack, how she got back to five blocks east. Is there? The testimony that I was drawn to is that she runs and she sees Diaz. So what her route is. She ran west and she ends up five blocks east. Your Honor, I can't confirm that. I would take your word for that. I can say that this is someone who may be so frightened, sure, but she ends up, the testimony that we need to focus on is that she finds Diaz. Now once you got away from the defendant after the second time, where did you go? I ran west down Division the same way I was walking. And did you see anybody? Yes. Then you saw the female. That's five blocks east. How do we get there? I'm not quite sure I understand the question. Did you see anybody? She ran west after the second attack. Diaz lives at 2547 Division. The victim is at 300 West Division, right? The gas station is 2805 Division. She's west of there. She's at least at 29. She says, after the second attack, I ran west and I ran into this woman. We know that's not true because she ran into Diaz right in front of Diaz's house, five blocks east. So certainly if the victim testified the wrong direction, the judge heard that inconsistency. She said she knew directions. She didn't testify to the wrong direction. What's important, though, is Ms. Diaz testifies that she gets to her in her state. How she gets there and navigates that, I would argue that that's an inconsistency that the trial court weighed and did not find too relevant to diminish the victim's credibility. I mean, the argument is how many inconsistencies until there's a question of her credibility that's beyond a pale. That, you know, you had one plus one plus one. Do we get three or do we still get zero? Your Honor, I think that's a question for the trial judge who is the trier of fact here, who weighed those inconsistencies. And we would never reverse a credibility determination. And it's not often that we do, but we do. Certainly, and I don't think that there was anything so improbable or unreasonable about a victim who's 14 years old, who's attacked by a stranger and, yes, perhaps fumbles her words. She does not, she declines to go to the hospital. That is not contrary to human experience. She wants to go home. I think Your Honor said that she wants to go to her family. But hours later, when Detective Burns comes to her house, she is willing. She wants to show him the route. She was in a state of shock. And I really think that most humans could empathize with that. So the trial judge heard her testimony and found it to be credible. Now, how many inconsistencies, I don't know. I just know that from its entirety. I think in Yergin or there's a case, Delgado, where the Supreme Court and this Court has referenced it, basically says one bad apple will spoil, you know, the whole. But it's really looking at testimony that's fraught with inconsistencies. And we don't have that here. I would point out there's a case, People v. Delgado, which is even more closely balanced. That victim there was 13 years old. She snuck out of her house late at night to go meet the defendant. They smoked marijuana in a park. He somehow penetrated her, whether it was digitally or with his penis. She felt something warm on her stomach. She goes home. The mother's there with the police because she had called the police. She was so worried. That victim did not make an outcry. Three days later, the victim told her mother she was raped. Even though that case, you know, was more closely balanced and there was a lack of physical evidence, which was not required. She snuck out of the house specifically to meet the defendant. Yes, yes. But this court found that her testimony, when viewed as a whole, was not so unconvincing or contrary to human experience and did find that defendant guilty of criminal sexual abuse, similar to this case. So I just want to remind the court that under the standard of review, there is no collaboration needed. But we do have it with Ms. Diaz and the video. There's no physical evidence required. And I think if you look at the facts here, that's not contrary or contradicting the victim's testimony here. Being in the store is not a crime. Lots of men were in the store. I can't see how you can base your whole case now on the video. It's not like he approached her in the video or had any interaction with her in the video. Nothing like that. Sure. So defendants seen in the video and the victim's testimony, she does not notice defendant. It's undisputed that the defendant's in the video, right? It's undisputed. What's crucial is the victim watches this video and she identifies her attacker. And there's nothing about Detective Byrne's testimony that said that identification was not reliable or incredible in any way. And the trial judge heard that testimony and the victim's testimony and heard about the second identification in the photo lineup and also saw her identification in court. So, Your Honors, moving on, I would – All right, I'm going to ask you to run quickly. Sure, absolutely. If you want me to respond to the final two issues, Counsel, I agree with Justice Hyman here. I think it's a tenuous stretch to say that at sentencing that the alcohol reference somehow indicated that the trial judge made his findings of guilt based on that. This is weeks later when we're at the sentencing hearing, and Your Honor pointed out it was when he was reviewing the and just following hearing mitigating factors. So this is just a trial judge who was sort of absorbing everything, and before he sentenced defendant to 30 months probation on a Class 4, which defendant could have faced one to three years, he was giving him some advice based on this report. I don't think that's out of the realm of a sentencing hearing. As far as the burden shift, the people completely disagree. That was – Let's say this was a jury trial, and in closing argument the prosecution said, the defendant offered you no explanation for his presence at the gas station at the same time as the victim. That would be reversible error, right? So during – Right? Yes. When the judge says to the defendant, how do you explain your presence at the gas station at the same time as the victim? How is that different? It's during counsel's closing argument, defense counsel, and I would argue it's more of a rhetorical question as this trial fact is weighing the facts here, and the fact is this defendant was at that gas station, and unfortunately for the defendant, the victim identified him in the surveillance thanks to Detective Byrne's good police work. So it's just making the connection there, if the defense is reasonable doubt or identity, it's making the connection there that she was able to identify him three times, really sort of – But it's reversible error for the prosecution to say the defendant didn't explain it, but it's okay when the judge says to defense counsel, how do you explain that? I don't get the difference. I don't think that in this case there's an affirmative showing of shifting the burden. I think we see the judge clearly knows the burden. We see that in his findings weeks prior when he finds the defendant guilty of initially criminal sexual assault and then the lesser included, criminal sexual abuse. So I would argue otherwise. I think the judge here clearly knows the burden and was asking a rhetorical question as he's sort of absorbing what is happening. And I think I misspoke, so this is not a sentencing. He heard the evidence and he was asking a rhetorical question, but just to make his findings. So I would argue there's no affirmative showing that he was shifting the burden, and he shows that when he makes his findings right after the closing arguments here. And I would point out, as Your Honor's pointed out, both of the latter two issues were forfeited. In closing, I would ask that you affirm defendant's conviction for criminal sexual abuse and thank you for your time. Thank you. All right, Ms. O'Daniel, briefly. Counsel suggests that it's our position that a heavier burden should fall upon them when it comes to a sex case. It's not our position at all. Burden is proof beyond a reasonable doubt. And with that said, there's no lighter burden because it's a young lady. There's no lighter burden because she may have been upset. And one thing that is not in the record, many things are not, but one thing is she didn't testify she was in a state of shock. She didn't testify that she was, you know, unable to process. There is no evidence of that in the record. And just listening to this argument today, there are so many times where the answer to a question from this court is, I don't know, I don't know, I don't know. Why? Because it's not in the record. This is not proof beyond a reasonable doubt. We're not asking for special treatment, but we're certainly not asking for lesser treatment. And with respect to the sentencing comment and my argument about the circumstantial relationship between drinking and the offense, circumstantial is not really a sentencing parlance word when you're sentencing an individual. This particular court talked about his belief that this offense was connected to, motivated by, influenced by this defendant's alcohol consumption. And to the point where, hey, you might have a problem. I'm not judging you. You know, that's an illness. Do some soul searching and see if I'm right. Well, that's not the standard that we have here. And those are the comments that were on the record. Just bottom line is the case was not proven beyond a reasonable doubt. And we are asking that the court reverse the conviction. Thank you very much. All right. We will take people versus Geronimo Ocampo under advisement. And Ms. Watson, will you call our next case?